1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
505 Lomas Santa Fe Drive
Suite 180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com

*Counsel for Plaintiffs Yueqiang Wang and*
*Tranquil Star Holdings Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

YUEQIANG WANG and TRANQUIL STAR HOLDINGS, INC., Individually and on Behalf of All Others Similarly Situated,

                    Plaintiffs,

          vs.

CEPTON, INC., JUN PEI, DONG CHANG, MITCHELL HOURTIENNE, JUN YE, GEORGE SYLLANTAVOS, MEI WANG, XIAOGANG ZHANG, TAKAHITO OTAKE, HIDEHARU KONAGAYA, TAKAYUKI KATSUDA, and CRAIG-HALLUM CAPITAL GROUP LLC,

                    Defendants.

Case No.:


**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**


**DEMAND FOR JURY TRIAL**

1    Plaintiffs Yueqiang Wang ("Wang") and Tranquil Star Holdings Inc. ("Tranquil Star," and
2    together with Wang, "Plaintiffs"), by and through counsel, allege the following upon information
3    and belief, except as to allegations concerning Plaintiffs, which are alleged upon personal
4    knowledge.  Plaintiffs' information and belief is based upon, among other things, their counsel's
5    investigation, which includes, without limitation: (a) review and analysis of public filings made
6    by Cepton, Inc. ("Cepton" or the "Company") with the U.S. Securities and Exchange Commission
7    (the "SEC"); (b) review and analysis of press releases and other publications disseminated by
8    Defendants (defined below) and other parties; (c) review of news articles, shareholder
9    communications, and conference calls concerning Defendants' public statements; and (d) review
10   of other publicly available information concerning the Company and the Individual Defendants
11   (defined below), including information disclosed through the breach of fiduciary duty action
12   related to the Merger (defined below) captioned *In re Cepton, Inc. Stockholder Litigation.*, No.
13   2025-0519-LWW (Del. Ch.) (the "Delaware Action").

14   <u>**NATURE OF THE ACTION**</u>

15       1.    Plaintiffs bring this class action for violations of: (i) Sections 14(a) and 20(a) of the
16   Securities Exchange Act of 1934 (the "Exchange Act"), on behalf of public holders of Cepton
17   common stock (the "Unaffiliated Stockholders") as of November 15, 2024 (the "Record Date")
18   who were entitled to vote on the "take-private" acquisition (the "Merger") of the Company by
19   Koito Manufacturing Co., Ltd. ("Koito"); and (ii) Sections 10(b) and 20(a) of the Exchange Act,
20   on behalf of all persons and entities (excluding Defendants, defined more fully below) who sold
21   Cepton common stock between July 29, 2024 and January 7, 2025, inclusive (the "Class Period"),
22   including those who sold into the Merger and were damaged thereby (together with the
23   Unaffiliated Stockholders,  the "Class").

24       2.    This action concerns Defendants' failure to provide Cepton shareholders with
25   adequate disclosure of all material information related to the Merger and making false assurances
26   about the fair value of the Company's common stock.  As a result, Unaffiliated Shareholders were

27

28

unable to properly evaluate the Merger, which caused them to accept Merger consideration that failed to adequately value Cepton common stock.  Additionally, Cepton shareholders were misled into selling Cepton common stock at a price that was materially below the fair value for their shares.

3.    Based in San Jose, California, Cepton provides high-performance, mass-market lidar technologies to enhance safety and enable autonomy across the automotive and smart infrastructure markets.

4.    As of July 2023, Koito, a Japanese automotive-lighting company, had invested $200 million in Cepton.  In return, it received common and preferred shares equal to 30.1% of Cepton's voting power (on an as-converted basis).  Koito also held two of the seven seats on Cepton's Board of Directors (the "Board").

5.    Before the Merger, from June 2023 through October 2023, Cepton received three inquiries from third-party companies regarding potential acquisition transactions.  Notably, on October 3, 2023, a prospective acquirer—identified in the Proxy (defined herein) as "Party C"— submitted a credible proposal that the Board elected not to pursue.  Yet, as detailed below, the Proxy provided only vague references to this credible third-party bid and failed to disclose that Party C's proposal valued Cepton at more than twice the Merger price ultimately approved by the Unaffiliated Stockholders.

6.    In July 2024, only days before the Merger's approval by the special committee charged with evaluating the transaction (the "Special Committee"), Cepton received a new production award that internal projections estimated would generate approximately $40 million in revenue over three years.  However, Defendant Jun Pei ("Pei")—Cepton's President, Chief Executive Officer, and Chairman of the Board from February 2022 through the closing of the Merger—failed to disclose this award to the Board.  Consequently, the fairness opinion issued by Cepton's financial advisor, Craig-Hallum Capital Group LLC ("Craig-Hallum"), did not incorporate the value of this award into its assessment of the Merger price.

7.    On July 29, 2024, Cepton and Koito entered into an agreement and plan of merger. Pursuant to the Merger, Koito would acquire all of the outstanding Cepton common stock in an all-cash transaction at $3.17 per share, and, as a result, Cepton would be taken private and remain a subsidiary of Koito.

8.    Prior to the shareholder vote, Defendants issued a Preliminary Proxy Statement on September 25, 2024, an Amended Preliminary Proxy Statement on November 13, 2024, a Definitive Proxy Statement on November 21, 2024, additional definitive proxy soliciting materials (the "Definitive Proxy Statement Supplement") on December 12, 2024 (together, the "Proxy"), and a Final Amended Definitive Proxy Statement on January 7, 2025.

9.    During the Class Period, Defendants authorized the filing of materially false and misleading Proxy statements, in addition to other SEC filings, that failed to provide all material information related the Merger, in violation of the Exchange Act.  Specifically, Defendants failed to disclose to investors that: (1) Cepton had received a credible third-party proposal valuing Cepton at more than double the Merger price; (2) the Board failed to explore the third-party proposal and concealed its terms when recommending that Unaffiliated Shareholders approve the Merger; (3) Defendant Pei had concealed the fact that Cepton received a new production award days before the Special Committee approved the Merger, resulting in the failure of Craig-Hallum's fairness opinion to account for the award in its valuation of Cepton; (4) due to the foregoing, the offer of $3.17 per share as consideration for the Merger substantially shortchanged the true value of Cepton common stock; and (5) in turn, Unaffiliated Shareholders were deprived of crucial information when considering whether to vote in favor of the Merger, and Cepton shareholders sold their shares at a price materially below the true value of Cepton common stock.

10.    The Merger was authorized and approved by a shareholder vote during the virtual special meeting (the "Special Meeting") held on December 20, 2024.  Later, the Merger closed on January 7, 2025.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
3

11.    The material misstatements and omissions of material facts in the Proxy prevented Plaintiffs and other Unaffiliated Stockholders from properly evaluating the Merger and caused them to accept Merger consideration that failed to adequately value Cepton common stock. Likewise, the material misstatements and omissions of material facts in the Proxy and related SEC filings caused Cepton shareholders to sell their stock at a price that failed to adequately reflect the true value of Cepton common stock.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under Sections 10(b), 14(a), and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a), 78t(a), and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5 and 17 C.F.R. § 240.14a-9.

13.    This Court has jurisdiction over the subject matter of those claims pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and (c), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District, as Cepton is headquartered in this Judicial District.

15.    In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## DIVISIONAL ASSIGNMENT

16.    Pursuant to Local Rule 3-2(c) and (e), this action should be assigned to the San Jose Division of this Court, as the Company's headquarters are in Santa Clara County, California.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
4

# PARTIES

17.     Plaintiff Yueqiang Wang sold Cepton common stock during the Class Period, as set forth in the accompanying certification, incorporated by reference herein, and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

18.     Plaintiff Tranquil Star Holdings, Inc. is a company incorporated in British Columbia, Canada, of which Yueqiang Wang is President.  Tranquil Star sold Cepton common stock during the Class Period, as set forth in the accompanying certification, incorporated by reference herein, and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

19.     Defendant Cepton is incorporated under the laws of Delaware, with its principal executive offices located in San Jose, California.  Before the Merger, Cepton's common stock traded on the Nasdaq Stock Market (the "Nasdaq") under the ticker symbol "CPTN."

20.     Defendant Jun Pei served as Cepton's President, Chief Executive Officer, and Chairman of the Board from February 2022 through the closing of the Merger.  Defendant Pei also signed the Proxy and related Merger Materials.

21.     Defendant Dong Chang ("Chang") served as Cepton's Interim Chief Financial Officer from January 2024 through the close of the Merger.

22.     Defendant Mitchell Hourtienne ("Hourtienne") served as Cepton's Chief Commercial Officer from September 2023 through the close of the Merger.

23.     Defendant Jun Ye ("Ye") served as a member of the Board from February 2022 through the close of the Merger.  Ye was also a member of the Special Committee.

24.     Defendant George Syllantavos ("Syllantavos") served as a member of the Board from February 2022 through the close of the Merger.  Syllantavos was also a member of the Special Committee.

1    25.    Defendant Mei (May) Wang ("Wang") served as a member of the Board from

2    February 2022 through the close of the Merger. Wang was also a member of the Special Committee.

3    26.    Defendant Xiaogang (Jason) Zhang ("Zhang") served as a member of the Board

4    from February 2022 through the close of the Merger. Zhang was also a member of the Special

5    Committee.

6    27.    Defendant Takahito Otake ("Otake") was Senior Managing Director and Chairman

7    of Koito's Board of Directors at all relevant times.  Otake signed the Proxy and related Merger

8    materials.

9    28.    Defendant Hideharu Konagaya ("Kongaya") served as a member of the Board from

10   January 2023 through the close of the Merger.  Konagaya signed the Proxy and related Merger

11   materials.

12   29.    Defendant Takayuki Katsuda ("Katsuda") served as a member of the Board from

13   February 2022 through the close of the Merger.

14   30.    Defendants Pei, Chang, Hourtienne, Ye, Syllantavos, Wang, Zhang, Otake,

15   Kongaya, and Katsuda (collectively, the "Individual Defendants"), because of their positions with

16   the Company and/or access to Company and Merger information, possessed the power and

17   authority to control the contents of the Company's reports to the SEC, shareholder letters, press

18   releases, and presentations to securities analysts, money and portfolio managers, and institutional

19   investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's

20   reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance

21   and had the ability and opportunity to prevent their issuance or cause them to be corrected.

22   Because of their positions and access to material non-public information available to them, the

23   Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and

24   were being concealed from, the public, and that the positive representations that were being made

25   were then materially false and/or misleading.  The Individual Defendants are liable for the false

26   statements pleaded herein.

27

28

1    31.    Defendant Craig-Hallum Capital Group LLC served as financial advisor to the

2    Special Committee for the Merger.

3    32.    The Company, the Individual Defendants, and Craig-Hallum are collectively

4    referred to as the "Defendants."

5    **SUBSTANTIVE ALLEGATIONS**

6    **Background**

7    33.    Cepton offers high-performance, mass-market lidar technologies to enhance safety

8    and enable autonomy across the automotive and smart infrastructure markets.

9    34.    As of July 2023, Koito, a Japanese automotive lighting equipment manufacturer,

10   had invested $200 million in Cepton in exchange for common and preferred stock representing

11   30.1% of Cepton's voting power on an as-converted basis, and held two of the seven seats on the

12   Company's Board.

13   35.    In October 2023, Koito asked the Board to form a Special Committee to negotiate

14   a potential transaction.  Subsequently, in December 2023, Koito made a proposal to acquire Cepton

15   for $3.17 per share in cash in a going-private transaction.

16   36.    Before the Merger, from June 2023 through October 2023, three third-party

17   companies inquired about potentially acquiring Cepton. Indeed, on October 3, 2023, "Party C," as

18   identified in the Proxy, made a credible proposal that the Board elected not to pursue.  However,

19   the Proxy provided only vaguely referenced this proposal and concealed that Party C's proposal

20   valued Cepton at more than twice the Merger price, which was later accepted by the Unaffiliated

21   Stockholders.

22   37.    In July 2024—only days before the Merger's approval by the Special Committee

23   on July 28, 2024—Cepton received a new production award which was internally projected to

24   generate approximately $40 million in revenue over three years.  Defendant Pei, however,

25   concealed this award to the Board, resulting in Craig-Hallum's fairness opinion not incorporating

26   the value of this award into its assessment of the Merger price.

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

7

**Defendants' Materially False and Misleading Statements**

**Issued During the Class Period**

38.     The Class Period begins on July 29, 2024, when Cepton issued a press release entitled "Cepton Signs Definitive Agreement to be Acquired by Koito," announcing the Merger. The press release stated in relevant part:

> Cepton, Inc. ("Cepton" or the "Company") (Nasdaq: CPTN), a Silicon Valley innovator and leader in high performance lidar solutions, announced today that it has signed a definitive agreement (the "Agreement") providing for the acquisition by KOITO MANUFACTURING CO., LTD. ("Koito") (TSE: 7276), a leading automotive tier one supplier, of all of the outstanding capital stock of the Company not owned by Koito for $3.17 per share in an all-cash transaction.

> Cepton stockholders will receive $3.17 per share in cash, which represents a premium of approximately 25.3% to the closing price as of Friday, July 26, 2024. The material terms of the transaction will be described in Cepton's current report on Form 8-K, which will be filed with the Securities and Exchange Commission today.

> The proposed transaction will complement Koito's existing sensor technology roadmap, while providing Cepton with the financial stability and scalability that are crucial to the commercialization of its lidar technology. After the transaction, Cepton will operate as a privately held indirect subsidiary of Koito in the U.S.

39.     On September 25, 2024, Cepton filed a Schedule 13E-3 containing the Preliminary Proxy Statement with the SEC in connection with the Merger. Defendants Pei, Otake, and Konagaya signed the Preliminary Proxy Statement. The Preliminary Proxy Statement details the "background of the Merger," in which the Preliminary Proxy Statement states the following about third-party proposals to merge:

> **Background of the Merger**

> * * *

> On June 2, 2023, Dr. Pei informed Koito-appointed board members, Mr. Hideharu Konagaya and Mr. Takayuki Katsuda (the "Koito Designees"), and members of Koito management on a call that certain executives of a LiDAR company listed on a U.S. stock

exchange ("Party A") approached him regarding a potential merger. Koito informed Dr. Pei that Party A was a competitor to the Company and Koito in relation to a potential business arrangement with a global original equipment manufacturer ("OEM-A") and for that reason discussions with OEM-A should be avoided. The discussions with Party A did not result in a formal offer or indication of interest.

On July 24, 2023, a second publicly traded LiDAR company ("Party B") submitted to the Company an unsolicited letter of intent proposing a merger transaction for stock consideration in the surviving company, and on July 26, 2023, Dr. Pei informed the Board of such proposal. On August 16, 2023, the Board held a special meeting and allowed a prospective financial advisor to provide a presentation on the merits of Party B's offer. The Koito Designees recused themselves from the special Board meeting and after some discussion, the Board determined not to pursue the transaction. Over the next several months, Koito and the Company considered the possibility of a take-private transaction in addition to other strategic alternatives.

On October 3, 2023, Dr. Pei received an unsolicited non-binding letter of interest from a potential strategic acquirer ("Party C"), which he promptly shared with the Board. Party C proposed an acquisition of Cepton by a merger transaction for stock consideration in the surviving company; however, the Board determined not to pursue the transaction.

40.    The Preliminary Proxy Statement described the following "reasons for the transaction" in determining, among other things, the fairness of the Merger to Cepton shareholders, in relevant part:

**Reasons for the Transaction; Recommendations of the Special Committee and the Board**

\* \* \*

- *Compelling Value Relative to Alternatives.* The Special Committee conducted a pre-signing market check process involving outreach by Craig-Hallum to potential counterparties for acquisition transactions. **The Special Committee determined that it was unlikely that any of those parties would complete a transaction on terms that were superior to the merger, taking into account, among other things, the stock ownership position of Koito in the**

**Company and the fact that Koito was consistent in its position that it has no interest in (and would not as a stockholder support or consent to) a disposition or sale of its holdings in the Company or any alternative change of control transaction involving the Company.** The Special Committee also considered the Company's standalone business strategy in the context of current economic and market conditions and the Management Projections and concluded that the merger would provide greater and more certain value to the Unaffiliated Stockholders than would reasonably be expected from the continued execution of the Company's strategic plan.

- *Certainty and Immediate Liquidity*.   The cash consideration of $3.17 per share of our common stock provides certainty, immediate value and liquidity to the Unaffiliated Stockholders while eliminating the effect on our stockholders of likely further dilution, long-term business and execution risk or to financial markets or economic conditions.

\* \* \*

- *Opinion of Craig-Hallum*.   At a meeting of the Special Committee on July 28, 2024, **Craig-Hallum rendered to the Special Committee its oral opinion that**, as of such date and based upon and subject to the various assumptions made, procedures followed, matters considered and qualifications and limitations set forth therein, **the merger consideration was fair, from a financial point of view, to the Unaffiliated Stockholders of the Company.** Such opinion was subsequently confirmed in writing on July 29, 2024.

41.    The Preliminary Proxy Statement also discussed the recommendation of the Special Committee, stating, in relevant part:

**Reasons for the Transaction; Recommendations of the Special Committee and the Board**

\* \* \*

**Recommendation of the Special Committee**

After careful consideration, including a thorough review of the Merger Agreement, the other transaction documents and the terms of the merger, and taking into account the presentations made to the

Special Committee and various other factors discussed and considered by the Special Committee, and after due consideration of its fiduciary duties under applicable law, **the Special Committee has determined that the terms of the Merger Agreement, the other transaction documents and the merger, including the merger consideration payable in connection therewith, are advisable, fair to, and in the best interests of, the Company and its Unaffiliated Stockholders. Accordingly, the Special Committee unanimously recommended that the Board approve, adopt and declare advisable and in the best interests of the Company and its stockholders the Merger Agreement, the other transaction documents and the merger.**

42.     The Preliminary Proxy Statement also discusses the opinion of Craig-Hallum given to the Special Committee, stating, "Craig-Hallum rendered its opinion to the Special Committee that, as of July 29, 2024, and based upon and subject to the factors and assumptions set forth therein, **the merger consideration to be paid to the Company's Unaffiliated Stockholders pursuant to the terms of the Merger Agreement is fair from a financial point of view to such stockholders.**"

43.     The Amended Preliminary Proxy Statement filed on November 13, 2024 and the Definitive Proxy Statement filed on November 21, 2024, both of which were filed with the SEC on Schedule 13E-3 and signed by Defendants Pei, Otake, and Konagaya, included substantially similar language as to the fairness of the Merger and the reasoning for not pursuing third-party proposals as described in ¶¶ 39-41.

44.     On December 10, 2024, Cepton filed additional definitive proxy soliciting materials (the "Definitive Proxy Statement Supplement") on Form DEF14-A.   Among other things, Definitive Proxy Statement Supplement provided the purported reasoning for not pursuing certain third-party proposals, stating:

**Supplemental Proxy Statement Disclosures**

* * *

On July 24, 2023, a second publicly traded LiDAR company ("Party B") submitted to the Company an unsolicited letter of intent

proposing a merger **of equals** ~~transaction~~ **whereby the shareholders of the Company and Party B would receive stock** ~~consideration~~ in the surviving company, and on July 26, 2023, Dr. Pei informed the Board of such proposal. On August 16, 2023, the Board held a special meeting and allowed a prospective financial advisor to provide a presentation on the merits of Party B's offer. The Koito Designees recused themselves from the special Board meeting and after some discussion, the Board determined not to pursue the transaction **due to the fact that Party B's market capitalization at the time was substantially less than that of the Company**. Over the next several months, Koito and the Company considered the possibility of a take-private transaction in addition to other strategic alternatives.

On October 3, 2023, Dr. Pei received an unsolicited non-binding letter of interest from a potential strategic acquirer ("Party C"), which he promptly shared with the Board. Party C proposed an acquisition of Cepton by a merger transaction for stock consideration in the surviving company **that would have resulted in Cepton becoming less than ten percent (10%) of the combined surviving company, therefore**; ~~however~~, the Board determined not to pursue the transaction.

45.     The Final Amended Definitive Proxy filed on January 7, 2025, filed with the SEC Schedule 13E-3 and signed by Defendants Pei, Otake, and Konagaya, included substantially similar language as the fairness of the Merger and the reasoning for not pursuing third-party proposals as described in ¶¶ 38-43, while also incorporating the amendments made in the Definitive Proxy Statement Supplement as described in in ¶ 44.

46.     During the Special Meeting held on December 20, 2024, the Merger was authorized and approved by voting Cepton shareholders. Thereafter, the Merger closed on January 7, 2025.

47.     The above statements identified in ¶¶ 38-45 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading. Specifically, Defendants failed to disclose to investors that: Defendants failed to disclose to investors that: (1) Cepton had received a credible third-party proposal valuing Cepton at more than double the Merger price; (2) the Board failed to explore the third-party proposal and concealed its terms when recommending that Unaffiliated Shareholders approve the

Merger; (3) Defendant Pei had concealed the fact that Cepton received a new production award days before the Special Committee approved the Merger, resulting in the failure of Craig-Hallum's fairness opinion to account for the award in its valuation of Cepton; (4) due to the foregoing, the offer of $3.17 per share as consideration for the Merger substantially shortchanged the true value of Cepton common stock; and (5) in turn, Unaffiliated Shareholders were deprived of crucial information when considering whether to vote in favor of the Merger, and Cepton shareholders sold their shares, including those who sold into the Merger, at a price materially below the true value of Cepton common stock; and (6) as a result of the above, Defendant's positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## Events After the Merger

48.    Defendants' material misrepresentations and omissions came to light on September 9, 2025, when a redacted version of a complaint was filed in the Delaware Action (the "Delaware Complaint"), *see* Delaware Action, Dkt. No. BL-19, following a review of books and records produced by Cepton in response to plaintiffs' demands made under 8 Del. C. § 220. *See id.* at 2. The crux of the Delaware Complaint is that the Merger was agreed upon "at a price that was so unreasonable as to shock the conscience" and recommended to Cepton shareholders with the Proxy that concealed critical facts. *See id.* ¶ 2. Importantly, the Delaware Complaint alleges that, among other things, "the Proxy failed to disclose Cepton's receipt of—and the Board's utter failure to explore—a credible third-party bid valuing Cepton at more than double the [the "Merger"] price." *Id.*

49.    Additionally, the Delaware Complaint asserts that Koito advanced the Merger proposal only ten days after Cepton "asserted a $39 million cost recovery claim against Koito arising from the cancellation of a production award with General Motors." *Id.* at 3 ¶ 3. It further alleges that Defendant Pei's finance team—said to be conflicted because they were "negotiating against their future employer"—cut the cost recovery claim by $19 million in connection with

preparing financial projections, causing Cepton's financial advisor, Craig-Hallum, to rely on a diminished cash flow figure in its valuation of the Company for the Merger. *See id.* The Delaware Complaint claims that this "$19 million reduction alone . . . decreased the value of Cepton in Craig-Hallum's analysis by $1.07 per share." *Id*.

50.     Moreover, Craig-Hallum's valuation analyses also "erroneously valued the Company on a liquidation basis—improperly subtracting more than $100 million in value ascribed to a liquidation preference from the enterprise value that Craig-Hallum derived for Cepton," which allegedly "further depressed the Company's equity value generated by Craig-Hallum's discounted cash flow analyses by $4.32 per share." *Id*. at 3-4 ¶ 4.

51.     The Delaware Complaint maintains that, had Cepton's cost recovery claim been properly accounted for and had Craig-Hallum "appropriately valu[ed] the Company on a standalone basis without regard to the liquidation preference," the Company's equity value allegedly would have increased to $8.49 per share, nearly 2.7x the Merger price. *Id.* at 4 ¶ 5.

52.     The Delaware Complaint also alleges that Craig-Hallum failed to account for "a new production award"—won just days before the Special Committee approved the Merger but concealed by Defendant Pei. *Id.* Had Craig-Hallum incorporated the internal projection of $40 million in revenue over three years tied to that new award, the Company's valuation would have been materially higher. *Id*.

53.     According to the Delaware Complaint, this higher standalone valuation would also have been consistent with the previous third-party interest valuing Cepton "significantly in excess of the [the Merger] consideration," following Cepton's "new business milestones in 2024." *See id*. ¶ 6. Despite this, the Board chose not to engage with the third party or convene a meeting to evaluate the more favorable proposal. *See id.* at 5 ¶ 7. Instead, the Board informed Koito of the higher proposal, prompting Koito to express its own interest in pursuing a take-private transaction. *See id*. ¶ 7.

54.    After approving Koito's proposal, the Board then recommended the Merger to Cepton shareholders based on the Proxy, which was allegedly wholly deficient.  For one, the Board "opaquely disclosed its receipt of a third-party proposal from 'Party C,'" without revealing its terms, and "misrepresented in the Proxy that it had reached an informed 'determin[ation] not to pursue the' superior proposal, 'when in fact the Board never even met to consider it.'" *Id.*  The Proxy also "prominently touted the Special Committee's purported 'market check' as supporting the fairness of the [the Merger], without disclosing that the market check had failed to include any outreach to" the superior bidder. *Id.*  In addition, the Complaint asserts the Proxy omitted material facts, including, among other things, Defendant Pei's concealment of Cepton's production award. *Id.*

55.    Ultimately, the Delaware Complaint asserts that the circumstances surrounding the Merger "constitute ingredients of a mulligan stew that tastes beyond foul" and that the Board "cannot have approved the [Merger] in good faith" as its members "failed to protect the interests of the Company's stockholders, failed to discharge their context specific duty to secure the best price reasonably attainable for stockholders, and instead merely capitulated to Koito at every turn." *Id.* ¶ 13.

## CLASS ACTION ALLEGATIONS

56.    Plaintiffs bring this action on their own behalf and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of Unaffiliated Stockholders who were entitled to vote on the Merger and the Class consisting of sellers of Cepton common stock from July 29, 2024 through the close of the Merger on January 7, 2025, including those stockholders who sold shares into the Merger.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

57.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Throughout the Class Period, common stock of Cepton actively traded on the Nasdaq (an open and efficient market). Millions of Cepton shares were traded publicly during the Class Period on the Nasdaq. As of November 1, 2024, the Company had more than 16 million shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Cepton or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

58.    Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

59.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that conflict with those of the Class.

60.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a.    whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

      b.    whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

      c.    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of Cepton;

d.      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Cepton;

e.      whether the market price of Cepton common stock during the Class Period was artificially deflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

61.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

<u>**UNDISCLOSED ADVERSE INFORMATION**</u>

62.    The market for Cepton's common stock was an open, well-developed, and efficient market at all relevant times.  As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, Cepton's common stock traded at artificially deflated prices during the Class Period.  Plaintiffs and the other members of the Class sold Cepton's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Cepton and have been damaged thereby.

63.    During the Class Period, Defendants materially misled the investing public, thereby deflating  the price of Cepton's common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Cepton's business, operations, and prospects as alleged herein.

These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's common stock to be undervalued and artificially deflated or maintained at all relevant times. Defendants' materially false and/or misleading statements during the Class Period directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class who sold the Company's common stock at artificially inflated prices and were harmed when the truth was revealed.

**SCIENTER ALLEGATIONS**

64.    For purposes of Count II, as alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

65.    The Defendants permitted Cepton to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially affected the value of the Company's common stock.

66.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Cepton, their control over, receipt, and/or modification of Cepton's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Cepton, participated in the fraudulent scheme alleged herein.

67.    Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on sellers of Cepton common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Cepton's business, operations, and management and the intrinsic

value of Cepton common stock and caused Plaintiffs and members of the Class to sell shares of Cepton common stock at prices materially below their true value.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

68.     As a result of their sales of Cepton common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

69.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Cepton who knew that the statement was false when made.

## LOSS CAUSATION

70.     As detailed herein, Defendants made or caused to be made materially false and misleading statements and omissions of material facts in the Proxy.  These materially false and misleading statements and omissions as set forth above caused Plaintiffs and other members of the Class to accept Merger consideration that failed to adequately value Cepton common stock.   As a result, Plaintiffs and other Class Members suffered damages under Section 14(a) of the Exchange Act.

71.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially deflated the price of Cepton common stock and operated a fraud or deceit on Class members by failing to disclose and misrepresenting the facts detailed herein.  This course of conduct misled the Class members and caused them, in reliance on the misrepresentations and on the market price of Cepton common stock during the Class Period, to sell their shares at a depressed price.  As a result of their sale of Cepton common

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
19

stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

72.    The market for Cepton common stock was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Cepton common stock traded at artificially deflated and/or maintained prices during the Class Period.  Plaintiffs and other members of the Class sold the Company's common stock relying upon the integrity of the market price of Cepton common stock and market information relating to Cepton and have been damaged thereby.

73.    At all times relevant, the market for Cepton common stock was an efficient market for the following reasons, among others:

   a.    Cepton common stock was listed and actively traded on Nasdaq, a highly efficient and automated market;

   b.    As a regulated issuer, Cepton filed periodic public reports with the SEC and/or the Nasdaq;

   c.    Cepton regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

   d.    Cepton was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

74.    As a result of the foregoing, the market for Cepton common stock promptly digested current information regarding Cepton from all publicly available sources and reflected

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
20

such information in the price of Cepton common stock.  Under these circumstances, all sellers of Cepton common stock during the Class Period suffered similar injury through their sales of stock at artificially deflated prices, and a presumption of reliance applies.

75.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNTS AGAINST DEFENDANTS

### COUNT I

**For Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated**

**Thereunder Against All Defendants**

76.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

77.    Defendants disseminated a false and misleading Proxy containing statements that, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, and in light of the circumstances under which they were made, misrepresented or omitted material facts necessary to make the statements therein not materially false or misleading.

78.    The Proxy was prepared, reviewed and/or disseminated by Defendants.  Each of Defendants authorized the dissemination of the Proxy, the use of their names in the Proxy and were involved in process leading up to the Merger.  By virtue of their positions within Cepton

and/or access to Company and Merger information, Defendants were aware of the misstated and omitted information alleged herein and their duty to make accurate statements and disclose all material information in the Proxy.

79.    Defendants were negligent in issuing a false and misleading Proxy.  Count I is not based on any knowing or reckless misconduct on the part of the Defendants. Count I does not depend, and the relevant facts do not allege, wrongdoing that sounds in fraud.  Count I is premised on the material misrepresentations and omissions in the Proxy, and the Defendants were negligent in failing to recognize this fact.

80.    Plaintiffs, while reserving all rights, expressly disclaim and disavow at this time any allegation that could be construed as alleging that this claim sounds in fraud against Defendants in connection with this Count.  This claim sounds in negligence and is based on Defendants' failure to exercise reasonable care to ensure the Proxy did not contain the material misstatements and omissions alleged herein.

81.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to Cepton shareholders.

82.    The Proxy was an essential link in causing Cepton shareholders to approve the Merger.

83.    By reason of the foregoing, Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

84.    Because of the false and misleading statements and omissions in the Proxy, Plaintiffs and the Class were harmed by a uniformed shareholder vote approving the Merger.

85.    This claim is brought within the applicable statute of limitations.

<u>**COUNT II**</u>

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated**

**Thereunder Against All Defendants**

86.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

87.    Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Cepton common stock; and (iii) cause Plaintiffs and other members of the Class to sell Cepton common stock at artificially deflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

88.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the sellers of the Company's common stock in an effort to maintain artificially low market prices for Cepton common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

89.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Cepton's business, operations, and prospects, as specified herein.  Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Cepton's business, operations, and prospects, which included the making of, or the participation

in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Cepton and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the sellers of the Company's common stock during the Class Period.

90.     Each of the Individual Defendants' primary liability and controlling-person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

91.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Cepton's operating condition, business practices, and prospects from the investing public and supporting the artificially deflated and/or maintained price of its common stock.  As demonstrated by Defendants' misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the

misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

92.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Cepton common stock was artificially deflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the shares and stock traded or trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiffs and the other members of the Class sold Cepton common stock during the Class Period at artificially deflated prices and were damaged thereby.

93.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs, the other members of the Class, and the marketplace known of the truth regarding the problems that Cepton was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have sold Cepton common stock, or, if they had sold such shares or stock during the Class Period, they would not have done so at the artificially deflated  prices that they paid.

94.    By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

95.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their sales of the Company's common stock during the Class Period.

## COUNT III

### For Violations of Section 20(a) of the Exchange Act

### Against the Individual Defendants

96.     Plaintiffs repeats and re-alleges each and every allegation contained above as if fully set forth herein.

97.     The Individual Defendants acted as controlling persons of Cepton within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

98.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

99.     As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their sales of the Company's common stock during the Class Period.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
26

1

**PRAYER FOR RELIEF**

2    100.    WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for relief

3    and judgment as follows:

4    a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the

5    Federal Rules of Civil Procedure on behalf of the Class defined herein;

6    b)    Awarding Plaintiffs and the other members of the Class damages in an amount that

7    may be proven at trial, together with interest thereon;

8    c)    Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment

9    interest, as well as their reasonable attorneys' and experts' witness fees and other

10    costs; and

11    d)    Awarding such other relief as this Court deems appropriate.

12    **JURY DEMAND**

13    Plaintiffs demand a trial by jury.

14

15    Dated: December 3, 2025                                    Respectfully submitted,

16

17                                                            */s/ David R. Kaplan*
                                                            David R. Kaplan

18
19                                                            **SAXENA WHITE P.A.**
                                                            David R. Kaplan (SBN 230144)
20                                                            505 Lomas Santa Fe Drive
                                                            Suite 180
21                                                            Solana Beach, CA 92075
                                                            Tel.: (858) 997-0860
22                                                            Fax: (858) 369-0096
                                                            dkaplan@saxenawhite.com
23
                                                            Marco A. Dueñas (*pro hac vice* forthcoming)
24                                                            10 Bank Street, Suite 882
                                                            White Plains, NY 10606
25                                                            Tel.: (914) 437-8551
                                                            Fax: (888) 631-3611
26                                                            mduenas@saxenawhite.com
27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
27

*Counsel for Plaintiffs Yueqiang Wang and
Tranquil Star Holdings Inc.*